UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JOHN WESLEY KIMBROUGH, III, <br><br> Plaintiff, <br><br> v. <br><br> DAWN BUSS, et al., <br><br> Defendants. | CAUSE NO. 3:23-CV-639-JD-MGG |

OPINION AND ORDER

John Wesley Kimbrough, III, a prisoner without a lawyer, filed an amended complaint. ECF 12. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, the court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

Kimbrough alleges that Deputy Warden Dawn Buss has a history of retaliating against him for exercising his free speech rights.[1] Between March 31, 2023, and July 11,

---

[1] Kimbrough indicates that his complaint concerns the time between March 31, 2023, and July 11, 2023. He notes, however, that Deputy Warden Buss' actions and comments leading up to March 31, 2023, suggest a desire to retaliate against him. On July 20, 2021, Kimbrough had a settlement conference scheduled with Warden Neal in another case, but that same day Deputy Warden Buss ordered that Kimbrough be moved out of E dorm because he did not have a job. Warden Neal intervened and ordered that Kimbrough would remain in E dorm. Kimbrough also notes that, between January and March 2023, his grievances were not being processed by Grievance Counselor Wallen. Counselor Jacqueline Mayes addressed this issue with Deputy Warden Buss, and she told Mayes she should not help Kimbrough

2023, Kimbrough alleges that Deputy Warden Buss retaliated against him at every opportunity because he filed a lawsuit against her in *Kimbrough v. Buss*, 3:21-CV-293-MGG (N.D. Ind. filed Apr. 28, 2021).

The retaliatory events at issue here began after a drunk and hallucinating inmate attacked Kimbrough unprovoked on March 31, 2023. Kimbrough responded by knocking the other inmate out. Both inmates were taken to solitary confinement and charged with Class C fighting. Kimbrough pled guilty even though he was not the aggressor. He was sentenced to the maximum time in segregation for the offense: 15 days. He believes he should have been released on April 15, 2023, but he was housed in solitary confinement for 88 additional days.

On April 26, 2023, Kimbrough sent a request to Warden Neal explaining that his time was up on April 15, 2023, and nobody seemed to know what was going on. Kimbrough asked Warden Neal to have him moved back to E dorm, where he has access to his spiritual support group. Kimbrough believes Deputy Warden Buss intercepted this communication, because she responded with "waiting on a bed, just like everyone else." ECF 12 at 6. The response was designed to make Kimbrough believe there were no beds available in general population. He subsequently learned that there were multiple beds open in E-dorm.

On May 8, 2023, Counselor Hayley Feidner told Kimbrough she received an email from Warden Neal's secretary asking about his status because his aunt had been

---

because he had mentioned Mayes in a complaint. Additionally, Kimbrough notes that, at an unspecified time before July 31, 2023, Deputy Warden Buss refused to allow him to receive religious articles of faith from Jerusalem Chronicle News Prison Ministry.

2

calling. On May 10, 2023, Counselor Feidner told Kimbrough that Unit Team Manager Pamela Bane knew Kimbrough's time was up but was not doing anything about it. Kimbrough later learned that Deputy Warden Buss ordered Unit Team Manager Bane to delay Kimbrough's classification release papers.

On May 23, 2023, Kimbrough sent a request to Unit Team Manager Bane telling her that his time was up, but he was still being held. He asked who was responsible for him being held and who was responsible for moving him out when his time was up. She responded by indicating that he would "go where the bed is open." *Id.* at 8. After many calls from Kimbrough's aunt and many emails from Warden Neal's secretary to classification, his classification papers were completed on May 25, 2023, about a month and a half after he should have been released.

Also on May 25, 2023, Counselor Feidner told Kimbrough that Deputy Warden Buss had ordered Unit Team Manager Bane not to move him out of solitary confinement, although there was room for him in E-dorm. Even after the classification papers were signed, authorizing his transfer back to general population, Kimbrough continued to be housed in solitary confinement, without explanation or justification, until July 11, 2023.

While in segregation, Kimbrough endured a variety of conditions that were harsher than those experienced in general population. He was only permitted to have a limited amount of clothing: one pair of socks, one t-shirt, and one pair of boxers. Laundry was only done once a week.

He was only permitted to order a limited amount of hygiene products. He was not permitted to have shampoo, conditioner, hair grease, or pink lotion. As a black man with long hair, Kimbrough's hair must be conditioned regularly for it to remain healthy. He suffered significant hair loss because he was unable to care for his hair properly when in segregation. He was not permitted to have his beard trimmers and does not use a razor because it causes ingrown hairs.

The cell Kimbrough was assigned was not cleaned before he was placed there. He had to remove two bags worth of trash. The walls, floor, ceiling, toilet, and sink were covered in years' worth of filth. Walls were cracked, crumbling, and had smoke residue from past fires. No cleaning supplies were provided. Kimbrough was exposed to smoke from inmates setting fires to protest their condition. He was also exposed to mace when it was used on other inmates in the unit.

From April 10, 2023, to June 23, 2023, Kimbrough was continually confined with no recreation or ability to call his family or lawyers. When recreation was provided, he was placed in a cage with a phone and basketball rim. He could not use the weights or walk in the grass.

He was not allowed to possess his medications for ulcerative colitis or headaches, so a nurse had to provide those. They were not provided at the times when Kimbrough usually took them, so he refused them all together.

Kimbrough was not permitted to order commissary food. This was a problem for Kimbrough because he has ulcerative colitis and soy makes his condition worse, causing diarrhea and upset stomach. His requests for a soy free diet were denied

because he is not allergic to soy, so commissary is the only way he has of meeting this dietary need. He was not permitted to order Pepto Bismol from commissary to help with his symptoms. He also could not order premium meals from commissary that were available to him when housed in general population. He lost 25 pounds in the first 30 days and a total of 50 pounds because he tried to avoid eating soy.

Kimbrough was not allowed to attend religious services or bible studies, and his mental health suffered due to his inability to participate. He contacted mental health on April 20, 2023, indicating that his mental state was unraveling due to solitary confinement. On April 26, 2023, Kimbrough sent a request to Warden Neal begging him to move him because he was losing his mind. He reached out to mental health again on May 2, 2023, and May 3, 2023, asking to be moved to G dorm for observation. No help was provided.

Kimbrough alleges that Deputy Warden Buss retaliated against him for bringing a previous lawsuit against her by ensuring that he remained in segregation for 88 days beyond the time required by his disciplinary conviction. "To prevail on his First Amendment retaliation claim, [Kimbrough] must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendant['s] decision to take the retaliatory action." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (quotation marks and citations omitted). Here, giving Kimbrough the benefit of the inferences to which he is entitled at this stage, the court finds that he has stated a retaliation claim against Deputy Warden

Buss. However, Kimbrough may not proceed against Unit Team Manager Bane or Warden Neal on a retaliation claim because he has not pled facts from which it can be plausibly inferred that Kimbrough's lawsuit against Deputy Warden Buss motivated their decisions related to Kimbrough's housing.

Kimbrough also argues that his Fourteenth Amendment due process rights were violated by holding him in segregation beyond April 15, 2023. The Fourteenth Amendment provides state officials shall not "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1. That said, due process is only required when punishment extends the duration of confinement or imposes "an atypical and significant hardship on him in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Seventh Circuit has "concluded that inmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) (citing *Lekas v. Briley*, 405 F.3d 602, 608–09 & 608 n.4 (7th Cir. 2005) ("[R]eassignment from the general population to discretionary segregation does not constitute a deprivation of a liberty interest.")); *see also DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property in their classifications and prison assignments."); *Healy v. Wisconsin*, 65 Fed. Appx. 567, 568 (7th Cir. 2003) ("[I]nmates do not have a protected liberty interest in a particular security classification.") (citing *Sandin*, 515 U.S. at 486).

Later cases, however, have questioned the conclusion that placement in nonpunitive segregation can "*never* implicate a liberty interest[.]" *See Williams v. Brown*, 849 Fed. Appx. 154, 157, n.3 (7th Cir. 2021) (emphasis added). Timing plays a part in the analysis, even when conditions are significantly harsher. *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697-98 & nn.2–3 (7th Cir. 2009) (collecting cases that held segregation of two to ninety days does not trigger due process concerns and stating, "In a number of other cases, we have explained that a liberty interest may arise if the length of segregated confinement is substantial *and* the record reveals that the conditions of confinement are unusually harsh.") (emphasis added); *see also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (recognizing "duration" is a component that plays a part in determining whether a liberty interest exists). Here, Kimbrough remained in segregation for 88 days beyond the 15 days required by his disciplinary conviction. When coupled with the conditions of confinement alleged by Kimbrough, that period of segregation may be sufficient. At this stage of the case, the court will permit Kimbrough to proceed on a Fourteenth Amendment due process claim against Deputy Warden Buss, Unit Team Manager Bane, and Warden Neal.

Kimbrough also alleges that the conditions he was subjected to while in segregation were unconstitutional. The Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). In evaluating an Eighth Amendment claim, courts conduct both an objective and a subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the alleged deprivation is

7

"sufficiently serious" that the action or inaction of a prison official leads to "the denial of the minimal civilized measure of life's necessities." *Id*. Although "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), inmates are entitled to adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). On the subjective prong, the prisoner must show the defendant acted with deliberate indifference to the inmate's health or safety. *Farmer*, 511 U.S. at 834. As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotation marks omitted). Kimbrough has not plausibly alleged that any defendant was deliberately indifferent to his safety while he was housed in solitary confinement. He alleges that Deputy Warden Buss took action to ensure he stayed in solitary confinement despite his disciplinary sentence being served, that Deputy Warden Buss ordered Unit Team Manager Bane to assist in keeping Kimbrough in solitary confinement, and that Warden Neal knew he was "losing his mind" in solitary confinement after he had served his time and did not ensure he was transferred to general population. While Kimbrough alleges he suffered a number of hardships while in segregation, as recounted on pages four through five of this order, he does not allege

8

the defendants were aware of those hardships, other than the limited and unexplained representation to Warden Neal that he was "losing his mind." These allegations do not permit a plausible inference that the defendants were deliberately indifferent to Kimbrough's health and safety while in solitary confinement.

When he was released, Deputy Warden Buss assigned Kimbrough to the same housing unit as the individual he had the fight with. He believes this was done in hopes that they would fight again. Instead, the other individual apologized and there were no further problems with him. To the extent Kimbrough believes that this was done in retaliation for bringing a lawsuit against Deputy Warden Buss, his allegations are far too speculative. Kimbrough was not personally targeted by this individual. He was drunk and hallucinating when he attacked Kimbrough, and the complaint does not suggest he posed an ongoing risk to Kimbrough. Kimbrough has not included any facts from which it can be plausibly inferred that being housed with this individual would likely deter future First Amendment activity. Furthermore, it cannot be plausibly inferred that Kimbrough's placement in the same housing unit as this individual was either intentional or motivated by retaliation.

Kimbrough also alleges that Warden Neal or the Indiana Department of Correction instituted unconstitutional policies that target black prisoners. He argues that not allowing black inmates in segregation to have conditioner or hair grease is a "death sentence to black hair," and his hair is a part of his culture and spirituality. ECF 12 at 24-25. To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a

9

discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). "To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Id.* Discriminatory purpose implies more than intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of its adverse effects upon an identifiable group." *Id.* at 645. Kimbrough's amended complaint does not contain any facts from which it can be plausibly inferred that class members were treated differently than non-members. Furthermore, the amended complaint does not contain any facts from which it can be plausibly inferred that Warden Neal or the I.D.O.C. maintains this policy at least in part because of its adverse impact upon black inmates. Therefore, he may not proceed on this claim.

Kimbrough also argues that denying him the hair care products he needed when he was in solitary confinement violated the cruel and unusual punishment clause of the Eighth Amendment. Conditions that merely cause inconveniences and discomfort or make confinement unpleasant do not rise to the level of constitutional violations. *Adams v. Pate*, 445 F.2d 105, 108-109 (7th Cir. 1971). Being deprived of hair care products does not rise to the level of a constitutional violation. Therefore, Kimbrough will not be allowed to proceed on this claim.

Kimbrough also believes the restrictions on clothing are inhumane. Kimbrough was limited to one pair of socks, one pair of boxers, and one t-shirt, and laundry was

10

done only once a week. However, "[h]aving to wear the same clothes for two or three weeks is not a deprivation of constitutional magnitude." *Gordon v. Sheahan*, No. 96 C 1784, 1997 WL 136699, at *8 (N.D. Ill. Mar. 24, 1997). Furthermore, Kimbrough concedes that he was provided with bar soap and could wash his own clothes with the soap he was provided. *See Passmore v. Josephson*, 376 F. Supp. 3d 874, 881-82 (N.D. Ill. 2019) (collecting cases finding no constitutional violation where inmates had the ability to launder their clothes themselves). Moreover, it is unclear how Kimbrough was harmed by the lack of clean laundry more regularly. *Myers v. Ind. Dep't of Corr.*, 655 F. App'x 500, 503-04 (7th Cir. 2016) (discussing when inadequate laundry procedures might violate the Eighth Amendment). The risk of harm from dirty clothes is too speculative, without more, to establish "an unreasonable risk of serious damage to the prisoner's future health." *See Henderson v. Sheahan*, 196 F.3d 839, 846-47 (7th Cir. 1999). Therefore, Kimbrough may not proceed on his claims related to limited clothing and laundry.

Kimbrough also argues that the policy preventing him from ordering food from commissary when in solitary confinement violates his rights. It does not. While Kimbrough asserts that he needs a soy free diet, no medical provider has ordered that he receive a soy free diet. A policy that prevents inmates in solitary confinement from ordering food from commissary does not violate the Constitution, so long as it provides inmates who have medical orders for specialized diets to receive food that satisfies those dietary requirements. Kimbrough had no constitutional right to purchase commissary goods to accommodate a specialized diet that no medical provider had ordered for him.

11

Kimbrough also alleges that, between April 10, 2023, and June 3, 2023, Kimbrough's attorney tried to schedule calls with him, but Warden Neal ordered that Legal Liaison Pam James not schedule attorney calls with Kimbrough. These allegations are too vague to state a claim.

Kimbrough alleges that his rights were violated by being unable to attend religious services while in solitary confinement. Prisoners have a right to exercise their religion under the Free Exercise Clause of the First Amendment. *Vinning-El v. Evans*, 657 F.3d 591, 592-93 (7th Cir. 2011). Nevertheless, correctional officials may restrict the exercise of religion if the restrictions are reasonably related to legitimate penological objectives, which include safety, security, and economic concerns. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). Moreover, the Supreme Court of the United States has long established "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). The policy preventing inmates in solitary confinement from attending in-person religious services is generally applicable and there are legitimate penological reasons for preventing inmates assigned to solitary confinement from participating in religious services, including safety and security. Therefore, Kimbrough may not proceed on a First Amendment claim based on his inability to attend religious services while in solitary confinement.

The Religious Land Use and Institutionalized Persons Act (RLUIPA) affords even broader protections than the First Amendment. This act prohibits governmental entities

12

from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a); *see generally Holt v. Hobbs*, 574 U.S. 352 (2015). Although money damages and injunctive relief are available under the First Amendment, only injunctive relief is available under RLUIPA. *Sossamon v. Texas*, 563 U.S. 277, 285 (2011). Kimbrough is no longer in solitary confinement and his disciplinary background does not suggest he is likely to return to solitary confinement in the future. Any claim for injunctive relief is moot, and he therefore cannot proceed under RLUIPA.

Finally, Kimbrough has sued the Indiana Department of Correction for implementing policies that allegedly resulted in cruel and unusual punishment, in violation of the Eighth Amendment. The IDOC is an arm of the state and, as such, cannot be sued in federal court under 42 U.S.C. § 1983. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). States and state agencies are not "persons" for the purposes of § 1983 and, therefore, cannot be sued for damages. *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *Williams v. Wisconsin*, 336 F.3d 576, 580 (7th Cir. 2003).[2]

Kimbrough is not proceeding in forma pauperis. Therefore, the court will not serve Deputy Warden Dawn Buss pursuant to 28 U.S.C. § 1915(d). Rather, it is his

---

[2] While Kimbrough seeks injunctive relief related to his claims that he needs hair moisturizers, access to more clothing or laundry, and access to commissary goods while in solitary confinement, the court has already explained that these allegations do not state a claim.

obligation to serve Deputy Warden Buss with a copy of the complaint and this screening order as provided by Federal Rule of Civil Procedure 4.

For these reasons, the court:

(1) GRANTS John Wesley Kimbrough, III, leave to proceed against Deputy Warden Dawn Buss in her individual capacity for compensatory and punitive damages for retaliating against him by ensuring he remained in solitary confinement for 88 days after he had served his disciplinary sanction, in violation of the First Amendment;

(2) GRANTS John Wesley Kimbrough, III, leave to proceed against Deputy Warden Buss, Unit Team Manager Bane, and Warden Neal in their individual capacities for compensatory and punitive damages for subjecting him to atypical and significant hardships while in segregation for 88 additional days following his term of disciplinary segregation, in violation of the Fourteenth Amendment;

(3) DISMISSES all other claims;

(4) DISMISSED the Indiana Department of Correction;

(4) DIRECTS the clerk to sign and seal a summons for Deputy Warden Dawn Buss, Unit Team Manager Pamela Bane, and Warden Ron Neal and send it to John Wesley Kimbrough, III; and

(5) ORDERS, under 42 U.S.C. § 1997e(g)(2), Deputy Warden Dawn Buss, Unit Team Manager Pamela Bane, and Warden Ron Neal to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

14

SO ORDERED on August 2, 2024

/s/JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT